# FOR PUBLICATION



**FILED**
Aug 08 2014, 9:10 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**TODD ESS**
Indianapolis, Indiana

**STEPHEN GERALD GRAY**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**IAN McLEAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| VICTOR KEEYLEN, | ) | |
| | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A05-1308-CR-419 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT,
CRIMINAL DIVISION 20
The Honorable Steven Eichholtz, Judge
Cause No. 49G20-1106-FA-40850

**August 8, 2014**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

Victor Keeylen ("Keeylen") brings this interlocutory appeal challenging the Marion Superior Court's denial of his motion to suppress. On appeal, Keeylen claims that both Article 1, Section 11 of the Indiana Constitution and the Fourth Amendment to the United States Constitution require the suppression of evidence he claims was discovered as a result of the police installing a GPS tracking device on his vehicles without a warrant. Although we agree with Keeylen that the warrantless installation and use of the GPS devices was improper, we nevertheless conclude that suppression of the evidence discovered during the execution of a search warrant on Keeylen's residence was not warranted under the particular facts and circumstances of this case. Accordingly, we affirm the trial court's denial of Keeylen's motion to suppress.

**Facts and Procedural History**

Keeylen was the subject of an extended narcotics investigation by the Indianapolis Metropolitan Police Department ("IMPD"). Detective Ryan Graber of the IMPD was the lead officer involved in the investigation, which included numerous controlled buys using various confidential informants. According to Detective Graber's probable cause affidavit, Keeylen sold cocaine and/or heroin to the police and confidential informants on February 3, February 11, March 6, and August 20, 2009. On August 26, 2009, a controlled buy was conducted at an automotive garage on East 21st Street in Indianapolis from an individual known as "Sammie," who indicated that Keeylen left cocaine at the garage for others to sell.

Also on August 26, 2009, the police filed a "Petition to Authorize Installation and Use of Global Positioning System Tracking Unit," in Marion Superior Court, Criminal

2

Division, Room 20, in which the police sought the permission of the trial court to install a GPS tracker onto Keeylen's 2007 Dodge Magnum. This petition was accompanied by the affidavits of Detective Graber and Officer Stephen Fitzpatrick ("Officer Fitzpatrick"). Officer Fitzpatrick's affidavit described the technical aspects of the GPS tracking unit, and Detective Graber's affidavit detailed the investigation of Keeylen, including the controlled buys, that had occurred thus far. The trial court granted the petition that same day in an order that reads in relevant part:

> COMES NOW the State of Indiana . . . and submits to the Court a Petition to Authorize Installation and Use of Global Positioning System Tracking Unit, with attached affidavit of Stephen Fitzpatrick. The Court, having examined the foregoing Petition . . . now FINDS that such petition should be granted.
>
> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by this Court, as follows:
>
> 1.  That law enforcement officers are hereby authorized to install a Global Positioning System (GPS) tracking unit upon the following vehicle:
>
>     > 2007 Dodge Magnum, Green/Gray in Color, Colts License Plate [], VIN# [].
>
> 2.  That law enforcement officers are further authorized to obtain, store and print any and all data collected and transmitted by the GPS tracking unit;
>
> 3.  That such GPS tracking unit may be installed by law enforcement officers upon any exterior portion of the vehicle described above and such GPS tracking unit may be connected to the battery of such vehicle;
>
> 4.  That such GPS tracking unit may be installed on (or later removed from) the vehicle described above while such vehicle is either in a public place or on private property where the general public would have access to such vehicle;
>
> 5.  That the authority granted by this Order shall continue for a period of thirty (30) days from the date of the signing of this Order.

3

6. That the Court shall maintain a copy of the Petition to Authorize Installation and Use of Global Positioning System Tracking Unit, with attached affidavits and shall also maintain a copy of this Order.

Ex. Vol., Defendant's Ex. B-1, pp. 8-9.

Following the issuance of this order, the police conducted another controlled buy in which they purchased heroin and cocaine from Keeylen in a public place. When the trial court's thirty-day authorization of use of the GPS tracking unit expired, the police petitioned the court for a thirty-day extension of the authorization, which the trial court granted on September 25, 2009. This thirty-day extension of authorization expired on October 25, 2009. Three days later, Detective Graber sought another thirty-day extension of authorization to use the GPS tracking unit on Keeylen's vehicle, which the trial court granted on October 28, 2009. On November 3, 2009, the police petitioned the trial court for permission to install another GPS tracking unit on Keeylen's 2003 Chevrolet Tahoe, and the court granted the request that same day.

Although the record is not entirely clear on the matter, the police apparently received another extension of authorization to use the GPS tracking units, which expired on December 24, 2009. Due to the holiday season, Detective Graber did not file a petition to extend the authorization until December 29, 2009, and the trial court granted the extended authorization. The police then sought and received extensions of authorization from the trial court until October 29, 2010.

During this period of 2010, the police continued their investigation of Keeylen, including additional controlled buys. Specifically, on February 25, Keeylen sold a small amount of heroin, stated that he had just sold a large amount of heroin, and would soon

4

have more; on March 15, Keeylen sold heroin to a confidential informant after making a quick stop at his home; on March 26, Keeylen sent an associate of his to sell heroin to a confidential informant after indicating that he was out of town and could not conduct the transaction himself; on April 26, Keeylen again sold heroin to a confidential informant in a public place; on July 2, Keeylen arranged a meeting with a confidential informant and one of Keeylen's associates, who sold heroin to the informant; and on September 16, a confidential informant bought heroin from another of Keeylen's associates.

On October 29, 2010, the police received an extension of authorization to use the GPS tracking units until January 29, 2011. In his affidavit attached to the October 29 petition requesting the extension of time, Detective Graber stated that Keeylen had been making repeated trips to Chicago, which Graber believed was to obtain more illicit drugs, and also stated that "law enforcement officers have learned, by monitoring his activities with these GPS units, that Keeylen has moved to a new residence." Id., Defendant's Ex. B-10, p. 8. Detective Graber later testified at the suppression hearing that one of the confidential informants had informed the police that Keeylen was moving to a new residence on Narrowleaf Drive. Detective Graber also testified that, upon learning this information, the police conducted "eyes-on" surveillance of Keeylen, during which they saw Keeylen and other individuals load furniture and belongings onto a moving van, drive to a house on Narrowleaf Drive, and unload the van.

The police also learned of Keeylen's address through a business owned by Keeylen, Go-Reala Entertainment. Specifically, the police noted that Keeylen was listed as the "Owner/President/CEO" of Go-Reala on the company's website. Although Marion

5

County property records indicated that Go-Reala had a business address on East 21st Street in Indianapolis,[1] Go-Reala's website listed the Narrowleaf Drive address as the business address. Detective Graber later averred in the probable cause affidavit that he believed the Narrowleaf Drive address was Keeylen's current address because surveillance indicated that Keeylen spent the night at the address multiple times per week. In addition, Keeylen instructed one of the confidential informants to send new customers to the Narrowleaf Drive address.

The trial court's authorization for the GPS tracking unit expired on January 29, 2011, and the police did not petition the trial court for permission to continue tracking Keeylen's vehicles until March 8, 2011, a span of thirty-eight days.[2] In his affidavit accompanying the March 8 petition, Detective Graber stated, "Since the prior issuance of authorization to monitor these GPS units, law enforcement has continued to monitor them to track target Keeylen, with minimal monitoring since approximately January 29, 2011. Due to ongoing matters, law enforcement has limited its monitoring since the lapse of the prior authorization." Id., Defendant's Ex. B-11, p. 7.

The trial court granted the petition extending authorization for an additional ninety days, and the police continued their ongoing investigation of Keeylen. On March 21, 2011, the police conducted a search of the trash at Keeylen's new residence on Narrowleaf Drive and discovered mail addressed to Keeylen at the Narrowleaf Drive

---

[1] The address listed was that of the automotive garage where Keeylen's associate "Sammie" sold illicit drugs for Keeylen.

[2] On March 3, 2011, during this lapse in authorization, the police observed Keeylen exchange something with another person in a car at the garage where "Sammie" worked, and when the police later pulled this car over, found cocaine in the driver's possession.

6

address, including a bank statement. And on May 25, 2011, a confidential informant was at the garage where Sammie worked and witnessed him renew his "deal" with Keeylen, whereby Keeylen would supply illicit drugs to the garage for Sammie and others to sell.

On June 7, 2011, Detective Graber applied for a warrant to search Keeylen's residence on Narrowleaf Drive. Detective Graber's probable cause affidavit detailed the extensive investigation of Keeylen, including Keeylen's frequent trips to Chicago, Illinois, and one to Atlanta, Georgia, but omitted the fact that the police had used the GPS tracking devices. The trial court issued the search warrant, which was executed that same day. During the execution of the warrant, the police discovered and seized heroin, cash, scales, drug paraphernalia, and a shotgun.

On June 10, 2011, the State charged Keeylen with Class A felony dealing in a narcotic drug, Class A felony possession of a narcotic drug, Class B felony unlawful possession of a firearm by a serious violent felon, and Class C felony possession of a narcotic drug and firearm. Keeylen filed a motion to suppress the evidence seized during the search of his house. Keeylen supplemented his motion on September 12, 2012, claiming that the seizure resulted from the warrantless use of GPS tracking devices. Two days later, Keeylen filed a motion for a Franks hearing,[3] claiming that Detective Graber had deliberately omitted information regarding the use of the GPS tracking devices from

---

[3] In Franks v. Delaware, 438 U.S. 154, 155-56 (1978), the United States Supreme Court held that that "where the defendant makes a substantial preliminary showing that a false statement knowingly or intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [was] necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held." A hearing at which the defendant is allowed to attack the validity of a search warrant in such a manner is referred to as a "Franks hearing." See Haynes v. State, 411 N.E.2d 659, 661 (Ind. Ct. App. 1980).

his application for a search warrant. The trial court held a hearing on the matter on November 19, 2012, and both parties submitted supplemental briefing after the hearing. On July 25, 2013, the trial court issued an order denying Keeylen's motions. That same day, Keeylen filed a petition to certify the trial court's ruling for interlocutory appeal, which the trial court granted. Keeylen filed a request that this court accept interlocutory jurisdiction on August 26, 2013. This court accepted jurisdiction on September 27, 2013, and the current appeal ensued. Additional facts will be supplied as necessary.

## Standard of Review

The standard of review from a trial court's denial of a motion to suppress evidence is similar to other sufficiency issues. Litchfield v. State, 824 N.E.2d 356, 358 (Ind. 2005). We determine whether there was substantial evidence of probative value to support the trial court's ruling. Id. In so doing, we do not reweigh the evidence, and we consider conflicting evidence most favorably to the trial court's ruling. Id. Unlike other sufficiency matters, however, we must also consider uncontested evidence that is favorable to the defendant. Westmoreland v. State, 965 N.E.2d 163, 165 (Ind. Ct. App. 2012).

Here, Keeylen challenges the propriety of the warrant to search his home. Both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution require probable cause for the issuance of a search warrant. Rader v. State, 932 N.E.2d 755, 758 (Ind. Ct. App. 2010). "Probable cause" is a fluid concept incapable of precise definition and must be decided based on the facts of each case. Id. In deciding whether to issue a search warrant, the task of the issuing magistrate is simply

8

to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place. Id. at 758-59. "Probable cause is only a probability or substantial chance of criminal activity, not a certainty that a crime was committed." Suarez v. Town of Ogden Dunes, Ind., 581 F.3d 591, 596 (7th Cir. 2009) (quoting Beauchamp v. City of Noblesville, Ind., 320 F.3d 733, 743 (7th Cir. 2003)).

The duty of a reviewing court is to determine whether the issuing magistrate had a substantial basis for concluding that probable cause existed. Rader, 932 N.E.2d at 759. Although we review this question *de novo*, we give significant deference to the issuing magistrate's determination. Id. We focus on whether reasonable inferences drawn from the totality of the evidence support the finding of probable cause. Id. "'In determining whether an affidavit provided probable cause for the issuance of a search warrant, doubtful cases are to be resolved in favor of upholding the warrant.'" Id. (quoting Mehring v. State, 884 N.E.2d 371, 377 (Ind. Ct. App. 2008)). We consider only the evidence presented to the issuing magistrate and not *post hoc* justifications for the search. Id.

**Discussion and Decision**

Keeylen argues that the probable cause affidavit supporting the issuance of the search warrant contained significant omissions that misled the issuing court. In Franks v. Delaware, 438 U.S. 154, 155-56 (1978), the Supreme Court held that that "where the defendant makes a substantial preliminary showing that a false statement knowingly or intentionally, or with reckless disregard for the truth, was included by the affiant in the

9

warrant affidavit, and [was] necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held." If an allegation of perjury or reckless disregard is established by the defendant, and the rest of the affidavit is insufficient to establish probable cause, "the search warrant must be voided" and any evidence obtained from its fruits excluded. Id. at 156.

Where the defendant's claim involves not the inclusion of false or misleading testimony in the affidavit, but the *omission* of information essential to a finding of probable cause, the claim is sometimes referred to as a "reverse-Franks" claim. See Smith v. Sheriff, Clay Cnty., Fla., 506 F. App'x 894, 897 (11th Cir. 2013) (citing Kimberly J. Winbush, Annotation, Reverse–Franks Claims, Where Police Arguably Omit Facts from Search or Arrest Warrant Affidavit Material to Finding of Probable Cause with Reckless Disregard for the Truth—Underlying Homicide and Assault Offenses, 72 A.L.R.6th 437 (2012)).

In the case of an alleged omission from the affidavit, the defendant must: (1) make a "substantial preliminary showing" that "the government affiant engaged in 'deliberate falsehood' or 'reckless disregard for the truth' in omitting information from the affidavit" and (2) show that probable cause would no longer exist if such omitted information were considered by the issuing judge. United States v. Atkin, 107 F.3d 1213, 1217 (6th Cir. 1997); accord Ware v. State, 859 N.E.2d 708, 718 (Ind. Ct. App. 2007) (adopting and applying "reverse Franks claim" analysis of federal courts). Franks protects only against omissions that are "designed to mislead, or that are made in reckless disregard of whether

10

they would mislead, the magistrate." United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990).

Here, Keeylen claims that the use of the GPS devices to monitor the movement of his vehicles constituted an improper search and that the police intentionally omitted the information regarding the GPS devices from the probable cause affidavit. Therefore, he argues that the probable cause affidavit and the search warrant based on this affidavit were faulty. This, of course, requires us to address several issues, including: whether the installation of the GPS devices constituted a "search," whether a warrant was required before such a search could be made, and whether the omission of this information from the probable cause affidavit means that the warrant was issued without probable cause. We address each of these issues in turn.

A. *Was the Installation of the GPS Tracking Units a "Search"*

The first issue we must address is whether the installation of the GPS tracking devices on to Keeylen's vehicles constituted a search for the purposes of the Fourth Amendment. Keeylen obviously claims that it does. This question was squarely addressed by the United States Supreme Court in United States v. Jones, 565 U.S. ___, 132 S. Ct. 945 (2012).

In Jones, the FBI and law enforcement officers for the District of Columbia attached a GPS device to the undercarriage of a vehicle being used by a suspected drug dealer and did so without a warrant. The officers tracked the vehicle by means of the GPS device for twenty-eight days and replaced the battery on the device once during this period of time when the vehicle was parked in a public parking lot. Based in part on the

11

data obtained from that monitoring, Jones was convicted of drug offenses. The United States Court of Appeals for the District of Columbia reversed the conviction, concluding that the warrantless use of the GPS device was contrary to the Fourth Amendment. Id. at ___, 132 S.Ct. at 949 (citing United States v. Maynard, 615 F.3d 544 (2010), *cert. granted sub nom*. United States v. Jones, 564 U.S. ___, 131 S.Ct. 3064 (2011)).

The Supreme Court granted certiorari and held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'" Id. at ___, 132 S. Ct. at 949; see also State v. Lagrone, 985 N.E.2d 66, 72 (Ind. Ct. App. 2013) (summarizing and applying Jones holding in concluding that attaching GPS tracking device to package containing marijuana was not a search).

Here, the facts of this case are not distinguishable from Jones in any significant manner, and we therefore conclude that the actions of the police in installing GPS tracking units on Keeylen's vehicles constituted a search.[4] See Jackson v. State, 996 N.E.2d 378, 384 (Ind. Ct. App. 2013) (assuming for purposes of discussion that

---

[4] We reject the State's brief argument that Jones should not be applied retroactively. It is well settled that:

> [a] decision of [the United States Supreme] Court construing the Fourth Amendment is to be applied retroactively to all convictions that were not yet final at the time the decision was rendered, with no exception for cases in which the new rule constitutes a "clear break" with the past. Final in this context refers to any case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied.

United States v. Smith, 741 F.3d 1211, 1221 (11th Cir. 2013) (internal quotations omitted) (citing Griffith v. Kentucky, 479 U.S. 314, 328 (1987); United States v. Johnson, 457 U.S. 537, 562 (1982)). The present case is an interlocutory appeal from the trial court's denial of Keeylen's motion to suppress, and Keeylen has yet to be convicted of anything. We therefore are unable to say that Jones does not apply retroactively.

12

placement of GPS tracking device on vehicle used by defendant was an improper search for purposes of the Fourth Amendment under Jones holding), trans. denied; United States v. Taylor, 979 F. Supp. 2d 865, 870 (S.D. Ind. 2013) (applying Jones and concluding that installation of GPS device on suspect's vehicle constituted a search for purposes of the Fourth Amendment).

B. *Probable Cause and Warrant Requirement*

Keeylen also argues that, because the installation of a GPS tracking device constitutes a search, it therefore follows that a warrant based on probable cause is required before the police can install such a device. Although the Supreme Court in Jones held that the installation and use of a GPS tracking device constituted a search for purposes of the Fourth Amendment, the Court did not directly address whether the police were required to obtain a warrant prior to the installation of such a device. See Jones, 565 U.S. at ___, 132 S.Ct. at 954; see also Lagrone, 985 N.E.2d at 72 n.4 (noting that Court in Jones "specifically declined to address whether that search was reasonable under the Fourth Amendment.").[5]

Still, we readily conclude that probable cause, not reasonable suspicion, is the standard that must be established before the police may engage in a "search" by installing

---

[5] As observed in United States v. Sparks, 711 F.3d 58, 62 (1st Cir. 2013), cert. denied, 134 S. Ct. 204:

> Few courts . . . have grappled with the warrant question so far, largely because the searches at issue in recent cases occurred pre-Jones, allowing the government to argue, and a number of courts to find, that the good-faith exception would apply even if the searches were unconstitutional. Those courts that have found GPS tracking to require a warrant have typically reached that conclusion by rejecting the government's attempts to fit GPS tracking within the Fourth Amendment's automobile exception. Some have also more broadly considered the balance of privacy and governmental interests at stake, concluding that the scales tip in favor of requiring a warrant.

(citations omitted).

13

a GPS device on a vehicle and monitor the vehicle's movements by means of such a device. See United States v. Ortiz, 878 F. Supp. 2d 515, 533 (E.D. Pa. 2012) (observing that "the intrusion on Fourth Amendment privacy interests occasioned by GPS tracker installation and monitoring is substantial" and that there were no legitimate law enforcement needs to use such devices beyond the normal need for law enforcement and rejecting the government's argument that reasonable suspicion was sufficient to support installation and use of GPS tracking device); United States v. Katzin, 732 F.3d 187, 201 (3d Cir. 2013) ("we hold that—absent some highly specific circumstances not present in this case—the police cannot justify a warrantless GPS search with reasonable suspicion alone."), reh'g en banc granted, opinion vacated;[6] State v. Sullivan, 2014 WL 1347978, 2014-Ohio-1443 (Ohio Ct. App., Apr. 3, 2014) (concluding that the installation and monitoring of a GPS device could not be justified by a showing of simple reasonable suspicion).

It is well-settled that warrantless searches "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967); see also Rybolt v. State, 770 N.E.2d 935, 938 (Ind. Ct. App. 2002) (citing Minnesota v. Dickerson, 508 U.S. 366, 372 (1993)). Accordingly, we also conclude that, absent extraordinary circumstances, a warrant is required before the police may conduct a "search" by placing a GPS device on a vehicle and monitoring the vehicle's movements by means of the GPS device. See State v. Mitchell, 323 P.3d 69, 77 (Ariz. Ct. App. 2014) (concluding that warrantless

---

[6] We recognize that the opinion in Katzin was vacated, but nonetheless find its reasoning persuasive.

14

placement of a GPS device and its subsequent use to track defendant's movements violated the Fourth Amendment); Kelly v. State, 82 A.3d 205, 214 (Md. 2013) (holding that warrantless tracking of defendant's vehicle without a proper warrant violated the Fourth Amendment); Hamlett v. State, 753 S.E.2d 118, 125 (Ga. Ct. App. 2013) (concluding that installation and monitoring of GPS device on defendant's vehicle constituted a search under the Fourth Amendment that had to be authorized by a valid warrant); State v. Zahn, 812 N.W.2d 490, 499-500 (S.D. 2012) (holding that warrantless attachment and use of a GPS device to monitor the defendant's movements for almost a month was improper under the Fourth Amendment); United States v. Taylor, 979 F. Supp. 2d 865, 870 (S.D. Ind. 2013) (holding that warrantless attachment and use of GPS device on defendant's vehicle constituted a warrantless search in violation of the Fourth Amendment);[7] United States v. Sellers, 512 F. App'x 319, 327 (4th Cir. 2013), cert. denied, 133 S. Ct. 2786 (holding that DEA agent's attaching of GPS device to suspect's vehicle and using that device to gain information about the suspect's whereabouts, all without a valid warrant, was a violation of the defendant's Fourth Amendment rights).[8]

---

[7] In Taylor, the federal District Court for the Southern District of Indiana was faced with a situation strikingly similar to that presented here. The Taylor court held that the placement of GPS tracking devices on the defendant's vehicles was an improper search, and held that the police could not rely on binding appellate precedent to justify the searches. See 979 F. Supp. 2d at 874 ("then-binding Seventh Circuit precedent was much more nuanced, and the Government did not attempt to 'scrupulously adhere[ ]' to it when utilizing the GPS Unit to track Mr. Taylor."). The court nevertheless held that the good-faith exception did apply because the police relied in objective good faith on the trial court's "authorizations" which approved of the installation of the GPS devices. See id. at 877. We note that Keeylen's appellate counsel represented the defendant in Taylor, but, surprisingly, neither Keeylen nor the State cite Taylor in their briefs.

[8] Our conclusion is the same under Keeylen's claim that the warrantless searches were unreasonable for purposes of Article 1, Section 11 of the Indiana Constitution.

15

C. *The Trial Court's Authorizations*

The State argues that, even if a search warrant was required, the police in the present case substantially complied with this requirement by seeking repeated authorizations of the use of the GPS devices from the trial court. That is, the State argues that what happened here was not the sort of "unfettered use of surveillance technology" that concerned the court in Zahn, 812 N.W.2d at 499, because the police did not act without judicial oversight.

As noted above, the police asked for, and received, repeated authorizations from the trial court permitting the police to install and monitor the GPS devices on Keeylen's vehicles. We agree with the State that it is not dispositive that the trial court's authorizations were not labeled "warrants." What the Fourth Amendment requires is that there be "written assurance that the Magistrate actually found probable cause to search for, and to seize, every item mentioned in the affidavit." Groh v. Ramirez, 540 U.S. 551, 560 (2004); see also United States v. Kone, 591 F. Supp. 2d 593, 608-09 (S.D.N.Y. 2008) ("Although the Order was not labeled a 'warrant,' 'nomenclature is not dispositive.'") (quoting Milner v. Duncklee, 460 F. Supp. 2d 360, 378 (D. Conn. 2006)). More specifically:

> [T]he defining features of a judicial search warrant are that: (a) it must be issued by a judicial officer; (b) the judicial officer must find that there is probable cause to believe that evidence of contraband is present in the place to be searched; (c) the probable cause finding must be supported by the information contained in the oath or affidavit; and (d) the warrant must describe with particularity the places to be searched and the things to be seized.

Kone, 591 F. Supp. 2d at 605 (citing Groh, 540 U.S. 551).

16

We agree with Judge Scheindlin in Kone, however, that "[t]he label, nonetheless, is significant." Id. at 605-06. As explained in Kone:

> In a typical case, where a putative warrant is labeled a "warrant" and explicitly purports to issue under . . . the Fourth Amendment's Warrant Clause, the omission of the term "probable cause" from the face of the warrant would not cast the slightest doubt on the conclusion that the warrant necessarily issued upon a judicial finding of probable cause. The reason, simply, is that a warrant, which is labeled a "warrant" and that purports to issue under . . . the Fourth Amendment, may issue only upon a judicial finding of probable cause. The Fourth Amendment requires no more than this implied finding.

Id. at 606.

In a case where a "warrant" is not sought, however, things are quite different. The State argues that there is no procedure for authorizing a search based on anything less than a showing of probable cause. But it is also true that, at the time that the trial court issued the authorizations, it was *not clear* that a warrant supported by probable cause was required before the installation and use of a GPS tracking device. Indeed, it is telling that the officers did not seek a "warrant." Their failure to do so suggests that the officers, by merely seeking an order of authorization, sought something less than a warrant, and, as is easily inferred, on less than probable cause. See Kone, 591 F. Supp. 2d at 609 (concluding that probation officers, in requesting an order to search probationer's home, sought something less than a Fourth Amendment warrant); cf. Taylor, 979 F. Supp. 2d at 877 (noting that federal government conceded that trial court's orders authorizing installation of GPS tracking devices was not the equivalent of a search warrant).

17

D. *Good Faith Exception*

The State argues that, even if the warrantless installation and use of the GPS tracking devices constituted an improper search, the good-faith exception to the exclusionary rule should apply. As summarized in Taylor, supra:

> The good-faith exception provides that evidence obtained as a result of a Fourth Amendment violation should not be suppressed if law enforcement had a "reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment." [United States v.] Leon, 468 U.S. [897,] 909 [(1984)] (citations and quotation marks omitted). Exclusion of such evidence is unwarranted because the exclusionary "rule's sole purpose . . . is to deter future Fourth Amendment violations," Davis [v. United States, ___ U.S. ___, 131 S. Ct. 2419, 2426 (2011)], and for an officer whose conduct is "objectively reasonable[,] . . . [e]xcluding [such] evidence can in no way affect his future conduct unless it is to make him less willing to do his duty," Leon, 468 U.S. at 919–20. Simply put, "[w]here the official action was pursued in complete good faith . . . the deterrence rationale loses much of its force." Id. at 919.

> Under this same logic, the Supreme Court recently held that the good-faith exception applies to "searches conducted in objectively reasonable reliance on binding appellate precedent." Davis, 131 S.Ct. at 2426. In Davis, at the time of the search at issue, the Eleventh Circuit had "established a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest." 131 S.Ct. at 2428. In conducting the search in Davis, law enforcement followed Eleventh Circuit precedent "to the letter"; the "officers' conduct was in strict compliance with then-binding Circuit law and was not culpable in any way." Id. In the Supreme Court's view, law enforcement's strict reliance on then-binding precedent "doom[ed]" the defendant's claim. Id. The Supreme Court explained: "About all that exclusion would deter in this case is conscientious police work. Responsible law-enforcement officers will take care to learn what is required of them under Fourth Amendment precedent and will conform their conduct to these rules. But by the same token, when binding appellate precedent specifically authorizes a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities." Id. at 2429 (emphasis in original) (citations and quotation marks omitted).

Taylor, 979 F. Supp. 2d at 871.

Here, however, it is not necessary for us to delve deeply into a good-faith analysis. This is because Keeylen is not seeking to suppress the information discovered as a direct result of the improper GPS tracking of his vehicles, i.e., where he was at a given time. Instead, he claims that this improperly-obtained location information was used to support the search warrant and that the trial court was not informed of this fact. More specifically, he seeks to suppress the evidence seized during the execution of the warrant to search his home on Narrowleaf Drive, claiming that, without the use of the improperly-obtained GPS information, the police could not properly support a search of his home. See Appellant's Br. p. 30 ("The core of this appeal is the search of [] Narrowleaf Drive and evidence derivative from that search. There is a single Fourth Amendment search warrant at issue here: the search warrant for [] Narrowleaf Drive.").

For purposes of our discussion, we can assume *arguendo* that the good-faith exception does not apply to the improperly-obtained GPS information. The issue before us then, is the effect of the use of this improperly-obtained GPS information and the omission from the probable cause affidavit of the manner in which this information was obtained.

D. *Reverse*-Franks *Claim*

As noted above, Keeylen makes a "reverse Franks claim" that the omission of this data was improper and that the warrant was therefore improperly issued. In the case of an alleged omission from an affidavit supporting an application for a search warrant, the defendant must establish (1) that the police engaged in a deliberate falsehood or reckless disregard for the truth in omitting the information from the affidavit, and (2) show that

19

the affidavit, if supplemented by the omitted information, would not have been sufficient to support a finding of probable cause. Ware, 859 N.E.2d at 718; Atkin, 107 F.3d at 1217. Franks protects only against omissions that are "designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate." Colkley, 899 F.2d at 301. This is where Keeylen's case falls short.

First, despite Keeylen's claims, we cannot say that he made a "substantial preliminary showing" that Detective Graber engaged in a "deliberate falsehood" or a "reckless disregard for the truth" when he failed to include in the probable cause affidavit the facts regarding the GPS tracking of Keeylen. See Ware, 859 N.E.2d at 718; Atkin, 107 F.3d at 1217. Detective Graber submitted the probable cause affidavit to the very same trial court and trial judge who had been authorizing the GPS searches for over a year. It is unlikely that he thought that the omission of this information would mislead the trial judge. Detective Graber also explained at the suppression hearing that the reason he omitted information regarding the GPS searches was not to mislead the trial judge, but to keep from Keeylen the fact that the police had been tracking his movements.

We are also unable to conclude that probable cause would no longer exist if the omitted information, i.e., the facts regarding the GPS tracking, had been considered by the trial court. See Ware, 859 N.E.2d at 718; Atkin, 107 F.3d at 1217. Keeylen makes no argument that the information included in the probable cause affidavit that was not discovered as a result of the GPS tracking is insufficient to support a finding of probable cause. Instead, he argues that the inclusion of the omitted information would eliminate the probable cause that did exist because it would reveal that the police learned of

Keeylen's address on Narrowleaf drive only through the improper use of the warrantless GPS tracking. We disagree.

In the probable cause affidavit submitted with the application for the search warrant, Detective Graber explained that he learned of Keeylen's association with the Narrowleaf Drive residence by Keeylen's business, Go-Reala Entertainment. Go-Reala's website listed Keeylen as the "Owner/President/CEO" and listed the business address of Go-Reala as the Narrowleaf Drive residence. Detective Graber also stated that he believed that the Narrowleaf Drive address was Keeylen's residence "through surveillance" and because "Keeylen ends his nights at this residence and does not leave the location until the next morning. He spends multiple nights per week at this location." Ex. Vol., State's Ex. A-2, p. 19. Keeylen claims that this "surveillance" is a reference to the improper GPS tracking, without which, he claims, the police would not have tied him to the Narrowleaf Drive address.

To be sure, in one of the affidavits seeking authorization to track Keeylen with the GPS device, Detective Graber stated that the police "learned, by monitoring [Keeylen's] activities with these GPS units, that Keeylen has moved to a new residence." Id., Defendant's Ex. B-10, p. 8. But Keeylen's argument ignores the fact that the police had also used Go-Reala's website to link Keeylen to the Narrowleaf Drive address. The probable cause affidavit also noted that Keeylen told one of the confidential informants to send new "customers" to the Narrowleaf Drive address. And the police confirmed

Keeylen's residence at the Narrowleaf Drive address by conducting a trash pull[9] which revealed that Keeylen was receiving mail, including a bank statement, at this address.[10] The fact that the police also used information from their GPS monitoring to learn of Keeylen's address does not mean that the police learned of Keeylen's new address *only* by means of the improper GPS monitoring.

Under all of these unique facts and circumstances, we therefore conclude that even if the information regarding the warrantless GPS tracking was included in the probable cause affidavit, the affidavit would have still supported a finding of probable cause to issue the warrant. The affidavit set forth the extensive, long-term investigation of Keeylen, which included numerous controlled buys, which was sufficient to find probable cause to support the search warrant. And there was information independent of the warrantless GPS tracking of Keeylen's vehicles which established Keeylen's connection with the Narrowleaf Drive residence.

## Conclusion

Even though the warrantless installation of the GPS devices and monitoring of Keeylen's vehicles was improper, the trial court did not err in concluding that Keeylen

---

[9] Keeylen does not argue that this trash-pull was improper. Indeed, given the numerous controlled buys that the police had conducted and the fact that they had connected Keeylen to the Narrowleaf Drive address, it is apparent that they had at least a reasonable suspicion that Keeylen was engaged in the trafficking of illegal drugs. See State v. Litchfield, 824 N.E.2d 356, 363 (Ind. 2005) (holding under Article 1, Section 11 of the Indiana Constitution that trash searches must be based on an individualized, reasonable articulable suspicion akin to that required for a Terry stop).

[10] We note that Detective Graber testified at the hearing on Keeylen's motion to suppress/Franks hearing that he learned of the Narrowleaf Drive address through one of his confidential informants. Detective Graber and other officers then confirmed this by personally watching Keeylen move personal items to his new residence. Keeylen claims that this is a in improper *post hoc* justification, but the other information listed above regarding the Narrowleaf Drive address was included in the probable cause affidavit and was sufficient to tie Keeylen's activities to the Narrowleaf Drive address.

failed to establish that the police engaged in deliberate falsehood or acted with a reckless disregard for the truth when they omitted the information regarding the GPS tracking devices from the probable cause affidavit. Nor did Keeylen establish that probable cause would no longer exist if the omitted information had been considered by the issuing judge. Accordingly, the trial court did not err in denying Keeylen's motion to suppress.

Affirmed.

FRIEDLANDER, J., and PYLE, J., concur.